IN THE TAX COURT OF THE
STATE OF OREGON

CORPORATION OF THE PRESIDING BISHOP
OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS

*v.*

DEPARTMENT OF REVENUE

(TC 4119)

James H. Bean, Lindsay, Hart, Neil, & Weigler, Portland; and David McConkie, Kirton & McConkie, Salt Lake City, represented Plaintiff (taxpayer).

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented Defendant (department).

Decision for Plaintiff rendered November 6, 1997.

**EDWIN J. PETERSON, Judge pro tempore.**

Plaintiff is a religious organization that is exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code. It operates a warehouse and a grain storage facility in Umatilla County. Both were exempt from ad valorem taxation from the time of completion in 1986 until tax year 1996-97 under either ORS 307.130 (exempts from real property taxation property used by charities) or ORS 307.140 (exempts from real property taxation property used for religious purposes).

In June 1996, the Umatilla County Director of Assessment and Taxation continued the exemption for the warehouse property but denied tax exemption for the grain storage facility. Plaintiff appealed to the Department of Revenue, which upheld the Umatilla County decision on January 29, 1997. Plaintiff then filed this action in the Tax Court, and the case was tried on October 7, 1997. The parties requested leave to file briefs. Briefs were filed and the case is now ready for decision. The court finds that the grain storage facility is entitled to exemption. Accordingly, the decision of the Department of Revenue is reversed.

In 1831, Joseph Smith, a prophet of the Mormon Church, received this revelation "embracing the law of the Church:"

> "[I]f there shall be properties in the hands of the church, * * * more than is necessary * * *, it shall be kept to administer to those who have not, from time to time, that every man who has need may be amply supplied and receive according to his wants.

> "Therefore, the residue shall be kept in my storehouse, to administer to the poor and the needy, as shall be appointed

by the high council of the church, and the bishop and his council."

In 1876, Brigham Young asked Sister Emmeline Wells to organize Mormon women to save grain against a day of need. Thereafter, Mormon women gleaned wheat fields to prepare a store of wheat for use in emergencies. Thus began Plaintiff's grain storage program. From time to time thereafter, wheat from the church storehouse program was used for such things as earthquake and fire relief in San Francisco, 1906; Chinese famine relief, 1906; United States food emergency following World War I, 1918; and more recently, 2,000,000 bushels of wheat for North Korean relief.

A central tenet of Mormon religious belief is that, as disciples of Christ, church members consecrate themselves to care for others in time of need. Harold Brown, Managing Director of Plaintiff's Welfare Service Department testified, "We cannot practice our religion without giving to the poor and needy. * * * Pure religion is to visit the fatherless and needy in their affliction." The wheat storage program was created to meet both a charitable and religious purpose.

Consistent with this tenet, the church created what is today known as the Welfare Service Department. The department has five basic operations: assistance in obtaining employment, sheltered workshops, social services, humanitarian services, and a storehouse production and distribution system that includes the grain storage program. The storehouse system utilizes church-owned facilities mainly located in the United States and Canada that are used to store and distribute, without charge, food and other commodities to the poor and needy. Plaintiff's regional storehouses are called Bishops' Central Storehouses. Approximately 140 basic food and commodity items are stored and available to those in need. Between 1992 and 1997, the church spent over $153 million in its worldwide humanitarian assistance programs for such things as furniture to North Tillamook County and cash to the American Red Cross for flood relief in Oregon, 1996; money to St. Mary's Church for a Stone Soup Kit, 1996; Hurricane Andrew relief, 1992; Somalian refugee relief, 1992; and Rwandan refugee relief, Zaire, 1994. Most of the

money was spent to aid persons who are not members of the church.

In 1981 Ezra Taft Benson, then President of the church, stated that the grain storage program had, "as its primary purpose the storage of edible wheat for the poor and the needy and to provide strategic reserves for short term emergencies." Nationally, at 60 larger capacity storage facilities, the grain storage program has a goal of storing 8.7 million bushels of wheat or beans at various locations around the country as a reserve against a calamity. In 1996 the total storage capacity of the 27 larger facilities located at diverse points in the United States was 5.715 million bushels. These facilities included Burley, Idaho (the largest, with 1.116 million bushels); Mesa, Arizona (220,000 bushels); Dallas, Texas (300,000 bushels); Los Angeles, California (200,000 bushels); Washington, D.C. (50,000 bushels); and Hermiston, Oregon (second largest, at 500,000 bushels).

Wheat is a perishable commodity; it cannot be stored indefinitely. Accordingly, the grain storage program rotates one-fourth of the wheat in storage every year, with the result that, generally, no wheat is over four years old. The rotation is accomplished by selling the older wheat on the open market and buying new wheat on the open market.

The church spends substantial sums each year to operate the grain storage warehouses. The only income of the program is money received each year from the sale of about one-fourth of the inventory. From its inception, the goal of the program has been to store wheat, not trade in wheat. The First Presidency, in a letter dated August 1940 stated, "It should always be borne in mind that **we are *storing* wheat, not *trading* in wheat.** The bins should always be kept as nearly full as possible, consistent with proper care." (Emphasis in original.) Because sales are fixed by the annual rotation policy, in some years the proceeds from the sale of the wheat are greater than the cost of the wheat. In other years the reverse is true. The operations have never generated a profit. Profit is not the goal.

The Hermiston facility was dedicated in 1986. It contains two main structures. One is a large warehouse that contains tents, food, clothing, tools, and scores of commodities

and other things that are needed in an emergency. Some of the things in that warehouse are perishable; others are not. There is a rotation policy for some of these things, as well. For example, powdered milk is rotated every nine months by giving away the older milk. All of these things are used to aid the needy in time of need. This is the portion of the property that Umatilla County exempted from real property taxation.

Within a hundred feet or so of the large warehouse is the grain storage facility, the property found by Umatilla County not to be exempt. It consists of eight large concrete silo-like elevators, a truck scale to weigh trucks and cargo, a railroad spur used for delivering wheat to the silos, grain-cleaning equipment, a mill to manufacture flour, and a small office. Although the facility has the capacity to mill flour, flour normally is not milled there. Plaintiff normally mills flour at a plant in Kaysville, Utah.

The Hermiston grain storage facility has a capacity of 500,000 bushels. Plaintiff tries to keep the facility "fairly full," between 400,000 and 500,000 bushels at all times. Unlike nearby commercial elevators, the Hermiston elevators contain sophisticated heat monitoring and high volume aeration equipment to monitor temperature and aerate the wheat. As with other grain storage facilities in the storage system, the Hermiston wheat is rotated so that about one-fourth of the wheat is sold every year. It is then replaced by fresh wheat purchased on the open market. The facility is not licensed as a grain dealer or a commercial storage facility.

Since 1986, no grain stored in the Hermiston elevators has ever been used in an emergency. On the other hand, the evidence is uncontradicted that the wheat in the elevators is held for the poor and needy in time of need and to provide strategic reserves for emergencies.

Paul Chalmers, the Umatilla County Director of Assessment and Taxation, testified that, unlike the products in the nearby exempt warehouse, grain is not a finished product. He said that because the wheat was not given away, the grain-storage facility was not being used for a charitable or benevolent purpose; therefore, the facility was not exempt from real property taxation. He added that the church, in

storing the grain for an emergency, was duplicating a service that the federal government provides.

The issues, then, are these: Is a facility in which a raw commodity—wheat—is stored to provide strategic reserves to be used to help needy persons exempt from ad valorem taxation even though no wheat stored in the facility has been given to others in time of need? The second issue is whether the periodic sale of and replacement of one-fourth of the wheat affects the charitable use of the facility.

■ ORS 307.130(1) provides, in part:

"[T]he following property owned * * * by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a) * * * [O]nly such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

■ Giving to the poor and needy is the essence of charity. The Random House Dictionary of the English Language, Second Edition (1987), page 348, defines "charity" as follows: "**1.** generous actions or donations to aid the poor, ill, or helpless * * *." It defines "charitable" as follows: "**1.** generous of donations or gifts to relieve the needs of indigent, ill, or helpless persons * * *."

Defendant concedes that the adjacent warehouse is a charitable use because that storage facility is part of a process of *giving* to the poor and needy. But as to the remaining property, it claims:

"Without something more, bulk-grain storage is not a qualifying charitable activity. * * * [The] poor and needy are not now actually receiving any gift, to justify removing the property from the tax roll. * * * [The statutory] requirement is that property be used actually and exclusively for a charitable purpose, which the courts have defined to require an element of 'gift or giving.' Although the grain *could be given away* at some time now or in the future, there is no evidence in the record of this case that any grain has to-date been given to anyone." (Emphasis in original.)

■ The *storing* of food, clothing, and commodities in the adjacent warehouse is a necessary part of Plaintiff's program to aid the poor and needy. In order to have grain on hand in time of calamity, the entity must have proper storage facilities. Even though none of the Hermiston wheat has to date been given away, the record shows that the church believes it must *store* grain for the poor and needy against the day of calamity. The absence of any gifts of grain from the Hermiston facility does not detract from or alter its intended and exclusive use.

■ The periodic rotation of the wheat through purchases and sales on the open market does not undercut this conclusion. There is no evidence that Plaintiff was in the grain business or that the profit motive was a material factor in the periodic purchase or sale of grain. Plaintiff, in storing the wheat, was, in a sense, a trustee. "A trustee is under a duty to use [due care] to preserve the trust property." *Lytle v. Payette-Oregon Irr. Dist.*, 175 Or 276, 288, 152 P2d 934 (1944). Wheat is a perishable commodity. The expenditure and receipt of funds to sell and buy wheat to keep the "corpus" fresh is consistent with that rule of law. Plaintiff acted reasonably and consistent with its stated charitable purpose in rotating the grain by open market purchases and sales. Rotation is "incidental to the prime purpose * * * and reasonably necessary to the accomplishment of that purpose." *Mult. School of Bible v. Mult. Co.*, 218 Or 19, 30, 343 P2d 893, 898-99 (1959) (construing ORS 307.130).

It is clear from the uncontroverted evidence that the primary use—indeed, the only use—of the Hermiston grain storage facility is the storage of wheat as required by the religious tenets of the church better to enable the church to provide for the hungry in time of need. Maintaining that capacity to provide wheat advances the charitable goals of the church and meets a basic and fundamental religious tenet of the church. It is difficult to avoid the conclusion that the property "is actually and exclusively occupied or used in the charitable work carried on by [the] institution" (paraphrasing ORS 307.130(1)(a)).

■ The Oregon Supreme Court has held that "[r]elief of a government burden is also an indicator of giving." *Dove*

*Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 431, 723 P2d 320, 324 (1986). There currently exists a federal grain storage program directing the Secretary of Agriculture to "establish, maintain and dispose of a separate reserve of inventories of not to exceed 75 million bushels of wheat, feed grains and soybeans for the purpose of alleviating distress caused by natural disaster." 7 USC § 1427A(a). Like Plaintiff's rotation program, the Secretary of Agriculture expressly is authorized to "sell, at an equivalent price * * * substantially equivalent quantities in different locations * * * to the extent needed to properly handle, rotate, distribute and locate such reserve." *Id.*, section (e).

Some might question the wisdom of Plaintiff's decision to spend millions of dollars on its grain storage program. It is not a court's function to substitute its judgment for the judgment of a charitable institution unless objective facts demonstrate a noncharitable use. Such facts are not present in this record.

Judicial opinions are usually couched in terms of ultimate certainty. I confess some uncertainty with this decision. Here there is no question of the *intended use* — to help the needy in the event of an emergency or disaster. Beyond doubt, this is a charitable goal.

But the essence of charity is *giving*. So far, no gifts of grain have been made from the facility. That troubles me. However, even though no *giving* has occurred from the Hermiston grain storage facility, the intended charitable use is clear. It exists as it has existed in Plaintiff's program for over 100 years. There is no evidence that Plaintiff has any other purpose in operating this facility. Plaintiff's program is not unlike the program of the federal government to store grain in the event of a disaster.

An exemption under ORS 307.130 has been established. It is not necessary to determine whether an exemption under ORS 307.140 has been established.

The decision of the Department of Revenue is reversed.